IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cr-30087 |
| | ) | |
| LAKESHIA N. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING OPINION

RICHARD MILLS, U.S. District Judge:

On March 7, 2013, the Court held a sentencing hearing as to Defendant Lakeshia N. Smith, who had previously pled guilty to crimes associated with counterfeit currency. The Court imposed a sentence of twenty-one months imprisonment on each of the seven counts of the Indictment [d/e 1], to run concurrent with each other.

This Sentencing Opinion primarily explains the Court's rulings on the objections to the Presentencing Investigation Report (PSR) [d/e 19].

I.

The following facts come from the "Offense Conduct" section of the PSR, to which no party objected:

1

In December 2011, the defendant, through a friend, made contact with "Rob" or "Rod" from St. Louis, Missouri, and made arrangements for him to fix her computer. When "Rob" or "Rod" came to her house to fix her computer, Jaavonte N. Carter (Carter) was also at her residence. According to the defendant, "Rob" or "Rod" was the defendant's and Carter's connection for counterfeit Federal Reserve Notes (FRNs).

On December 28, 2011, a representative from Dress Barn, Springfield, Illinois, reported to the Springfield, Illinois, Police Department that two individuals, later identified by law enforcement officials as being the defendant and Carter, passed 15 counterfeit $50 FRNs and purchased merchandise totaling $647.91. In return, they received genuine currency totaling $102.09. The store representative informed police that on the same date, Carter contacted the store, identified herself, and inquired about returning some of the merchandise she had previously purchased. . . .

Furthermore, the investigation revealed that Carter and Tonisa Carter (T. Carter), attempted to return some of the purchased items that had been previously purchased from Dress Barn, Springfield, Illinois, to the Dress Barn, Fairview Heights, Illinois, for genuine currency. This store had been previously advised by the Dress Barn, Springfield, Illinois, that 15 counterfeit FRNs had been passed earlier in the day and provided descriptions of the defendant and Carter. A Fairview Heights, Illinois, Police Department officer questioned Carter and T. Carter about the merchandise and their photographs were taken. Carter and T. Carter were not taken into custody. They left the merchandise they attempted to return at the store upon leaving. . . .

On the same date, a representative from Payless Shoe Source, Springfield, Illinois, reported to the Springfield, Illinois, Police Department that two individuals, later identified by law enforcement officials as being the defendant and Carter, passed four $50 counterfeit FRNs and purchased merchandise totaling $178. In return, they received genuine currency totaling $22. . . .

On December 29, 2011, a representative form Starbucks Coffee Company, Springfield, Illinois, reported to the Springfield, Illinois, Police Department that two individuals, later identified by law enforcement officials as being the defendant and Carter, passed two $50 counterfeit FRNs and purchased merchandise totaling $9.07. In return, they received genuine currency totaling $91.43. . . .

On January 11, 2012, a representative from Dollar General Store, Springfield, Illinois, reported to the Springfield, Illinois, Police Department that two individuals, later identified by law enforcement officials as being the defendant and Carter, passed two $50 counterfeit FRNs and purchased merchandise totaling $11.52. In return, they received genuine currency totaling $89.04. . . .

On January 26, 2012, agents voluntarily met with Carter, at the Madison, Illinois, Police Department. Agents informed Carter that she was a subject of an investigation involving counterfeit FRNs. She informed agents she would like to consult an attorney prior to questioning. As a result, the meeting with Carter concluded and she was not taken into custody pending additional investigation. Carter has not been charged with activities relating to the instant offense.

On the same date, agents voluntarily interviewed the defendant at her residence in Madison, Illinois. She informed agents she believed that Starbucks , Springfield, Illinois, and Dress Barn, Springfield, Illinois, were the first places she presented counterfeit FRNs. She stated Carter provided her with the counterfeit FRNs during their trip to Springfield. The Defendant reported that after they made their purchases at Dress Barn, they travelled back to Madison, Illinois. She advised that Carter and T. Carter traveled to Dress Barn, Fairview Heights, Illinois, and attempted to return Carter's previously purchased merchandise valued at $400 for genuine currency, but this was thwarted because they were approached by the police. The defendant advised she only passed counterfeit FRNs at Starbucks, Dress Barn, Payless Shoe Source, and Dollar General Store, Springfield, Illinois. She stated the last transaction she made with counterfeit

FRNs was at the Dollar General Store on January 11, 2012. Furthermore, agents seized the merchandise she purchased from Dress Barn, being a coat and two pairs of boots. At the conclusion of the interview, the defendant was not taken into custody pending additional investigation.

The investigation of this conspiracy concluded that from on or about December 28, 2011, to on or about January 11, 2012, the defendant possessed, passed, or attempted to pass a total of $1,150 worth of FRNs at retail stores in Springfield, Illinois.

PSR [d/e 19], ¶¶ 10-18 (paragraph numbers omitted).

The Defendant was charged with one count of conspiring to defraud the United States and six counts of passing counterfeit Federal Reserve Notes. *See* Indictment [d/e 1]. She pled guilty on September 27, 2012, and the plea was accepted on October 22, 2012. *See* Minute Entry of Sept. 27, 2012; Report and Recommendation on Plea of Guilty [d/e 11], and Text Order of Oct. 22, 2012.

II.

The PSR was prepared by the probation officer, and the Defendant had two objections that were not resolved prior to sentencing.

4

A.

1.

The Defendant contended that she was a minimal participant in the offense, and that, as a result, she was entitled to a four-level reduction in the offense level.

Specifically, the Defendant claimed that Jaavonte Carter and "Rob"/"Rod" were the sources of the counterfeit notes, that they operated a broader conspiracy, and that Smith was merely a recruit who had limited knowledge of the broader plan. *See* Defendant's Sentencing Memorandum [d/e 13], pp. 2-3, 5-6.

2.

The Guidelines Manual states the following:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> > (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
> >
> > (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

The Application Notes provide helpful guidance. Regarding the four-point reduction for minimal participants, U.S.S.G. § 3B1.2(a) "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of the group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. § 3B1.2 n.4.

Regarding the two-point reduction for minor participants, U.S.S.G. § 3B1.2(b) relates to a participant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 n.5. Application Note Five refers to another description, which sets the floor for any reduction under U.S.S.G. § 3B1.2: "This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2 n.3(A).

So, if a participant is substantially less culpable than the average participant, they get a two-point reduction. If the participant is plainly among the least culpable of those involved in the conduct of the group,

they get a four-point reduction. If their conduct falls in between, they get a three-point reduction.

3.

In *United States v. Milton-Browner*, No. 11-16127, 2012 WL 5519666, at *2 (11th Cir. 2012), the Eleventh Circuit gave useful guidance regarding mitigating role reductions. There, the court concluded that when a defendant was only being held accountable for a limited sub-conspiracy, the relevant question was whether they played a minor or minimal role in the sub-conspiracy, not whether they played a limited role in the larger conspiracy.

Here, the conspiracy as charged relates solely to passing counterfeit Federal Reserve Notes in Springfield, Illinois. *See* Indictment [d/e 1]. Therefore, even if "Rob"/"Rod" was operating a much larger conspiracy, it is of no moment, because the Defendant is not being held accountable for that larger conspiracy.

Therefore, the Court concludes that the relevant inquiry is whether the Defendant was a minor or minimal participant in the conspiracy related to Springfield, Illinois.

4.

It is apparent that the Defendant was a key player in the conspiracy related to Springfield, Illinois.

The Defendant drove her vehicle to Springfield, and was not reimbursed for using her vehicle.

The Defendant was aware of where the counterfeit notes came from and how much "Rob"/"Rod" charged for the counterfeit notes.[1]

It seems that Jaavonte Carter and the Defendant were almost-equal partners. Carter charged the Defendant the same amount to purchase counterfeit bills as "Rob"/"Rod" charged Carter.

The interaction between "Rob"/"Rod" and Carter and the Defendant was arms-length—once the counterfeit notes had been purchased, he did not want any change back, or any proceeds from the return of the illicitly-obtained merchandise. *See* Ex. [d/e 15-1], p. 10. Moreover, Carter and the Defendant planned on splitting evenly all proceeds from returning merchandise. *See id.* ("Lakeshia said they would have split the profit from the return transactions at Dress Barn.").

---

[1] "Rob"/"Rod" charged $25 in genuine currency for every $100 in counterfeit currency. *See* Ex. [15-1], p. 10.

Regarding the return transactions, Carter and the Defendant actively coordinated their efforts, with Carter asking the Defendant for advice via telephone when she saw police arrive at the Fairview Heights, Illinois, Dress Barn store. *See id.* at p. 9.

The Defendant defined the scope of the conspiracy as involving primarily herself and Carter. *See id.* at p. 10.

5.

Here, the Court concludes, after reviewing the relevant criminal discovery, reading the sentencing commentaries and the PSR, listening to the arguments of counsel and the testimony of the Secret Service Special Agent, that the Defendant is neither substantially less culpable than the average participant, nor is she plainly among the least culpable involved in the conduct of the group.

Assuming Defendant's statements made to law enforcement are true, the Defendant may be less culpable than Jaavonte Carter. However, even according to her statement, she is not <u>substantially</u> less culpable than Carter, let alone <u>plainly among the least culpable</u> involved.

9

B.

The Defendant objected to thirteen paragraphs contained in the "Other Criminal Conduct" section of the PSR, which describe criminal cases against the Defendant in which she was arrested and charged, but not convicted. The Defendant argued that these paragraphs should not have been included in the PSR, pursuant to *United States v. Lopez-Hernandez*, 687 F.3d 900 (7th Cir. 2012).

These kinds of objections about arrests or dismissed cases are meritless.

Information regarding arrests or charges filed that did not result in conviction <u>should be included in the PSR</u>. Every arrest of a defendant is to be included by the probation officer in the PSR, except those that were the result of mistaken identity. *See United States v. Guajardo-Martinez,* 635 F.3d 1056, 1059 n.1 (citing Probation and Pretrial Services Monograph 107, Presentence Investigation Report §§ 335.60, 335.70, 335.80).

District judges are entitled to rely upon arrest information in the PSR when there is a sufficient factual basis in the police reports or other documents to conclude that the alleged conduct occurred. *See Lopez-*

*Hernandez*, 687 F.3d at 902. Furthermore, there are situations when uncontested arrest records which lack any sort of underlying facts may be relied upon—in conjunction with other factors such as the number of the arrests, the offense alleged at the time of arrest, and the nature of the instant offense—to impose a sentence at the high end of the Guideline Range. *See id.* at 903-04.

Therefore, *Lopez-Hernandez* implicitly suggests that this type of information should be included in the PSR, so that it can be considered by a district judge, under the appropriate circumstances.

However, in this case, the Court did not consider law enforcement contact referenced in the PSR which did not lead to conviction.

### III.

At the sentencing hearing, Defense counsel objected to the Court's imposition of Supervision Special Condition No. 2, regarding the Defendant being obligated to pay for cognitive based therapy, as directed by the Probation Office. Defense counsel objected due to the Defendant's indigent status. The Court overruled the objection, noting that it was a routine condition imposed on most Defendants sentenced in this Division of the Court.

According to the Supervising Probation Officer for this Division, to date, no offenders have been directed by the Probation Office to pay for cognitive based therapy.

Offenders would be directed to pay for these services only if they had the ability to pay or if the services were covered by their health insurance.

Given the Defendant's financial profile, it is anticipated that she would only be required to pay for therapy if she were to receive some sort of windfall, such as lottery or sweepstakes winnings.

In any event, the Defendant is free to petition the Court for a change in her conditions of supervised release upon her release from the Bureau of Prisons.

ENTER: March 19, 2013

FOR THE COURT: /s/ Richard Mills
Richard Mills
United States District Judge